# IN THE OREGON TAX COURT

## SOUTHERN PACIFIC TRANSPORTATION COMPANY
*v.*
## DEPARTMENT OF REVENUE
(TC 1423, 1603, 1864, 2040 and 2199)

John H. Doran, George L. Kirklin and O. Meredith Wilson, Spears, Lubersky, Campbell, Bledsoe, Anderson & Young, Portland, represented plaintiff.

David L. Canary and James C. Wallace, Assistant Attorneys General, Department of Justice, Salem, represented defendant.

Decisin part for plaintiff and part for defendant rendered January 11, 1989.

## CARL N. BYERS, Judge.

At issue in these appeals is the true cash value of that portion of the plaintiff's railroad system located in Oregon for the assessment years 1980 through 1984.[1] The ad valorem tax is assessed by defendant in accordance with the provisions of ORS 308.515.

Southern Pacific Transportation Company, a Delaware corporation, (SPT) is a wholly owned subsidiary of Southern Pacific Company, a holding company. In addition to the railroad property owned by SPT, it also owns subsidiary railroads, the whole of which comprises a railroad system stretching from the west coast through the southern states to a terminating point in Illinois.[2] During the five tax years in question, the miles of track varied from 20,000 to 22,000 miles as a result of various acquisitions and abandonments. Although plaintiff owns thousands of railroad cars and locomotives, little need be said about the property itself. Rather, the magnitude of the case moves the level of discussion and analysis away from the property to matters of finance and investments.

Oregon may tax only that property located in Oregon. Since a railroad comprises an integrated operating unit of property, it is necessary to value the whole unit and then

---

[1] The cases, one for each assessment year, have been consolidated for trial.

[2] Subsidiary railroad companies are St. Louis Southwest Railway Co., Northwestern Pacific Railroad Company, Holton Interurban Railway Co., Petaluma & Santa Rosa Railroad Co., Visalia Electric Railroad Co., Chicago Rock Island and the Pacific Railroad Company, the last two lines being acquired in 1980.

allocate part of that value to Oregon. The relevant portion of ORS 308.555 provides:

"The department, for the purpose of arriving at the true cash value of the property assessable by it, may value the entire property, both within and without the State of Oregon, as a unit. If it values the entire property as a unit, either within or without the State of Oregon, or both, the department shall make deductions of the property of the company situated outside the state, and not connected directly with the business thereof, as may be just, to the end that the fair proportion of the property of the company in this state may be ascertained."

■     The taxable value includes the "going concern value" associated with an operating property. (ORS 308.510.) See also *Southern Pacific Trans. Co. v. Dept. of Rev.*, 295 Or 47, 664 P2d 401 (1983). The primary focus of these cases is on the total unit value. No significant differences exist between the parties as to the percentage of the unit that is allocable to Oregon.

Before discussing the evidence it may be helpful to identify the methods of valuation used in this case. There are three traditional approaches to value: cost approach, market approach and income approach. In these cases, the appraisers gave no weight to the cost approach. The building of plaintiff's system is part of the history of our nation. The cost of replacing or reproducing that system may have very little relationship to its current value.

In common parlance, there is no "market" for railroads of this size. As a result, the appraisers resorted to the stock and debt approach as a surrogate for the market approach. The problem is that plaintiff is a wholly owned subsidiary, hence there is no pure measure in the securities market of plaintiff's stock. Use of this approach requires the appraisers to ascertain the value of the whole conglomerate corporation and then allocate that value among the several parts.

The income approach may be applied in its traditional form although certainly not without controversy due to the forms of income, government regulation, competition and the need to measure the income of only the taxable unit.

*Definition of Taxable Unit*

Plaintiff contests inclusion by defendant of four of plaintiff's subsidiaries as part of the taxable unit. The four companies briefly identified are:

1. Southern Pacific Equipment Co., which owns and rehabilitates railroad rolling stock which it then leases to plaintiff.

2. Pacific Fruit Express, a private car company, used primarily for perishable goods. This company also repairs and services cars for plaintiff and other railroads and leases cars from plaintiff.

3. Evergreen Freight, a private car company used primarily by the timber industry. Due to the recession of 1980-82, all of the leases held by Evergreen Freight were transferred to plaintiff.

4. Evergreen Leasing, a finance company formed to raise capital for Evergreen Freight.

■ Plaintiff contends that ORS 308.515(1)(a) distinguishes between railroad transportation and private car companies and therefore these four companies are not part of the railroad operating unit. However, this assumes that the statute precludes one from being part of the other. The court believes that the purpose of the distinction is to identify properties subject to central assessment, not define the unit. There is nothing in either ORS 308.515(1)(a) or 308.555 to indicate a legislative intent that the two types of rail property must be separately as well as centrally assessed.

The question that must be answered is whether these four companies are integrated with plaintiff's operation so as to require their inclusion in the unit. There is scant evidence on that point, probably because the issue is of little consequence to the overall value of the unit. Defendant's appraisers included all four because they were wholly owned and because they believe that the four companies function as part of the rail unit. Plaintiff contends that they are not part of the rail unit, but submitted little evidence to support its point of view.

One of plaintiff's employees stated that he believed Southern Pacific Equipment Company deals solely with plaintiff. The other three companies appear to operate to

some degree as part of plaintiff's railroad operation. One question unanswered for the court is whether plaintiff deals with these subsidiaries on an arm's-length basis. Based on the record before it, the court must conclude that plaintiff failed to show that these subsidiaries are not part of its rail unit.[3]

## Correct Measure of Income

█       The income approach requires a correct determination of the net income or net cash flow. The magnitude of plaintiff's operations makes this analysis complex and extensive. The first step is to determine what types of income should be included in income or cash flow. Since plaintiff is subject to regulation by the Interstate Commerce Commission (ICC) and submits detailed financial reports, the appraisers for both parties have used those reports in preparing their appraisals. The disputed points and the court's conclusions are as follows:

1.   *Account 510 income.* Plaintiff has excluded and defendant has included income classified as Account 510 income. Defendant maintains that the ICC classifies "tangible rail transportation property" as "Road and Equipment" (Account 731) and it is this property that produces Account 510 income. Defendant believes it is reasonable to include such income in its estimate for the income approach.

On the other hand, plaintiff argues that 510 income, labeled as "miscellaneous rent income," is not part of the railroad and does not reflect benefits derived from the operation of the railroad transportation unit.

█       The court finds that 510 income should be included. ICC Regulations provide that 731 property, from which the 510 income is derived is "used or held for use as transportation property."[4] There is no question that the property, consisting of station grounds, rights-of-way, and like property is "directly connected" with the railroad business. (ORS 308.555.) It would seem that if such property is not included in the unit being centrally assessed, it would escape taxation.

---

[3] There is no question by either side that the trucking subsidiary owned by plaintiff should be excluded.

[4] This language is similar to that found in ORS 308.510 which would include in the taxable unit property "used or held * * * for or in use in the * * * business."

Further, ORS 308.510(4)(c) provides that the railroad is deemed the user of property situated in station grounds and rights-of-way which is leased to others.

The ICC Regulations also indicate that part of the property classified as Account 731 property are structures whose primary use is for a railroad and "is an integral part of the carrier's transportation plant." The ICC Regulations provide for such property to be moved to Account 737 only when its primary use changes. At that point, the income would no longer flow to or be accounted for in Account 510. It is significant that plaintiff is the one that decides whether property is to be classified as Account 731 and part of the unit, or 737 and not part of the unit.

2. *Surplus properties.* In the course of managing its railroad system, plaintiff determines that some property is surplus and is no longer necessary to the system. Plaintiff contends that such property should not be included in the unit. The court finds that until plaintiff actually disposes of such property, whether it be a branch line or a billboard, it remains part of the system. Management's decision as to what constitutes surplus is too tenuous a basis for exclusion from a taxable unit. Plaintiff points out, with regard to Account 510 income and surplus property, that defendant is now taking a position contrary to its long-term administrative practice. This point is answered by noting that this case involved the most extensive discovery ever experienced by this court. Defendant's former lack of knowledge is not a good basis for continuing an administrative practice.

3. *Gains on the sale of property.* Plaintiff claims that it is error for defendant to include in the estimated cash flows gains realized from the sale of property because the value of such property is already included in defendant's terminal value. (Defendant estimates a terminal value for the system at the end of its ten-year discounted cash flow.) Plaintiff contends that including such income will constitute double counting. The fallacy of plaintiff's position is its assumption that the unit is a static pool of assets. In reality it is more like a living organism which is constantly shedding its steel skin. Defendant's terminal value at the end of the projected cash flow represents the value of the system as it exists *then,* with all replacements and changes anticipated by the allowance for

depreciation. On the other hand, the sale proceeds from the bits and pieces sold off on an ongoing basis merely reflect the last benefits which will flow from ownership of those items of property. The court finds that excluding gains from the sale of property would understate the total income derived from the operation of the unit on an ongoing basis.

4. *Gains from the sale of tax benefits.* During some of the years in question, under provisions of the Internal Revenue Code, plaintiff sold certain tax benefits to other corporations for cash. In general, those tax benefits were credits and depreciation deductions associated with the purchase and use of tangible property. Plaintiff sold the benefits because it had insufficient income to use them to its own advantage. Defendant included the sales proceeds as income because such benefits were part of the total benefits that could be derived from ownership of the tangible property subject to taxation in this case.

The court agrees with plaintiff that the sale of the tax benefits is a sign of financial weakness. It is inconsistent for defendant to project growth and future prosperity based in part on the sale of tax benefits. If plaintiff prospers in the future as anticipated by defendant's appraiser, it would use those tax benefits to reduce its own federal taxes (which appear already accounted for at an appropriate level). In addition, the court is unpersuaded that a purchaser would count on such benefits. The income tax statutes change too often to project the continuation of such benefits ten years into the future. The court finds that gains from the sale of tax benefits should not be included in income.

5. *Interest income from working capital.* None of the appraisers included interest income from working capital in their appraisals, but defendant now argues in its brief that both appraisers erred in excluding it (making defendant's value too low).[5] Defendant's argument posits that "going concern" value includes intangible as well as tangible property. Defendant argues that intangible value is to be excluded only where (1) it is held for the money equivalent, and (2) it can be exchanged without affecting the business of the company. *See*

---

[5] Although this issue was not raised at trial, no additional evidence is required to resolve it.

*Southern Pacific Trans. Co. v. Dept. of Rev.,* 295 Or 47, 63 n 12, 664 P2d 401 (1983).

The court agrees with defendant's test, but finds that interest on working capital meets that test. ORS 308.510(1) specifically excludes "items of intangible property that represent claims on other property *including money at interest.*" (Emphasis added.) That specific exclusion is an expression of legislative intent not to tax the value of cash by capitalizing its interest income. By definition, if working capital is drawing interest it is not working in the unit and should be excluded. The statute appears intended to tax only capital that is currently employed in the business, the value of which is reflected in the inventory, prepaid expenses, credits, etc., of the business. Cash drawing interest from a bank may be "held for use" in operations but it is not currently being "used." The best measure of its nonuse is the interest it draws from employment outside the unit. The court finds that interest income from working capital should not be included in valuing the unit.

6. *Deferred income taxes.* Defendant contends that plaintiff errs in failing to include deferred income taxes in its measure of income. This is a noncash deduction from income which defendant maintains should be added back to reflect the true cash flow from the property. In support of its position, defendant notes that plaintiff relies on accounting figures in estimating net cash flow. When plaintiff changes from depreciation accounting to retirement-replacement-betterment (RRB) accounting, its estimate of net cash flow changes. Estimates of net cash flow should not be affected by accounting changes.

Plaintiff's position is that deferred income taxes do not grow in a mature industry where replacement is approximately equal to depreciation. Plaintiff argues that any benefit from deferred income taxes is a result of retained earnings producing a greater return than the cost of capital. The court is uncertain as to the relevance of this argument. The benefit that flows from deferred income taxes is the time use of money. That is, although plaintiff shows a book deduction, it has the use of the cash until some future time when the taxes which have been deferred will fall due. This will occur when, if

ever, plaintiff's replacement costs are less than its depreciation deductions.

In these cases, the evidence established that inflation alone will cause future replacement costs to exceed the current depreciation costs. Plaintiff recognized this.[6] Historically, replacement costs have consistently exceeded depreciation allowances. Since the number of miles of track are not increasing but decreasing, the "gross capital expenditures" are for replacement and not new investments. Plaintiff pointed out that railroads did not increase their capacity from 1974 to 1984. Even if they had, the court agrees with defendant that you cannot separate replacement from new investments for purposes of calculating returns. The court finds that accounting income figures should be adjusted for accelerated depreciation deductions. The purpose of such adjustment is to reflect the increase in present value that results from the use of the noncash deduction into the future.

7. *Investment Tax Credits.* Plaintiff's primary argument with regard to investment tax credits (ITC) is that they are already accounted for in the accounting net earnings. That is, in computing Net Railroad Operating Income (NROI), taxes are already reduced by the ITC. It is appropriate to note at this point that a distinction must be made between accounting earnings, which may be used in a direct capitalization income approach, and net cash flows, which are used in a discounted cash flow method. Accounting earnings should be comparable to the accounting earnings being used in the market to derive the capitalization rate (which expresses the relationship between the earnings and the known price or value of the company). In these cases defendant failed to establish that the reported accounting earnings, which the investment community looked to in purchasing the stock of the comparable companies (properties), reflected the use of investment tax credits. Therefore, plaintiff's accounting earnings should not be adjusted for ITC. On the other hand, it appears that ITC should be included in the discounted cash flow approach.

---

[6] Plaintiff's appraiser nevertheless applies his model on the assumption that depreciation and replacement costs are the same.

*Appraisal Perspective*

The appraisals of the parties in these cases are a study in contrast. Plaintiff's chief witness, an expert in railroad appraisals, in the court's view, represents a pessimistic point of view. He sees the railroad industry as having been largely bypassed by changes in the economy and technology. The iron horse is trailing in the dust of trucks for freight and planes for passengers. The economic shift in emphasis from farm and industry to services, plus half a century of government regulations, have left the railroads weak and anemic. In his view, the golden age of railroads has passed and will not return. He points to the decline in the number of railroads and miles of track as just one sign of the inherent limitations of the railroads. The decline in revenue is evidence of a failure to keep up. He notes that the railroad rate of return has not exceeded 5 percent since 1929. He concludes that the railroads are "revenue inadequate" and, because their capital replacement exceeds their depreciation, they have "chronic capital shortages." Although he recognizes that the Staggers Act deregulated the railroads, he is not optimistic about its overall results.

> "Unfortunately, in spite of the Staggers Act, the industry has not come close to achieving revenue adequacy and indications are that its rate of return on investment will be less than its cost of capital for the foreseeable future. Accordingly, when compared with the superior returns available in other industries, railroads will continue to be unattractive investments."

On the same page in his appraisal report he notes that if the Staggers Act is repealed, "it will return the railroads to the stranglehold of oppressive regulation and plunge them once again into a vicious downward spiral."

Defendant's appraisers are cheerful optimists. They focus on current and future events and not on the long history of the railroads. Even the losses realized by the railroads are viewed by them as common to most industries which are forced to make drastic changes in response to a recession. They state, "[w]hile the recession was severe, it set the stage for one of the greatest advances in the economy and corporate values since the Great Depression." They see the Staggers Act

as a major benefit. If the ICC finds that railroads are revenue inadequate, they see that as simply freeing the railroads from rate regulation. They see the growth of the railroads "tied closely to GNP growth." They note, for example, that the rebound in 1983 indicates "expectation of solid growth in the future." Looking at the "dramatic rise in rail stocks," defendant's appraisers conclude that "[t]he railroad industry has exhibited growth approximately equal to the average industrial firm."

If not fairly characterized as differing like night and day, then certainly the appraisers' views are like dusk and dawn. This is not to cast dispersion on the appraisers. The facts they see are true. The wide disparity in their opinions seems to arise from the level of analysis: each is attempting to foretell the economic future of a significant element of the national economy. Such attempts frequently meet with the same degree of success as weather forecasters.

The court cannot accept plaintiff's view of an anemic railroad industry. If the future of the industry were as bad as it portrays, it would be better to liquidate and invest in something else. Instead, plaintiff has invested extraordinary amounts of capital in the railroad; in excess of $1.4 billion from 1979 to 1983. Defendant, on the other hand, appears to portray a return to the glory days of the 1800s. That position is just as unlikely in view of the competition from trucking and airlines and the inevitable economic cycles.

*Appraisal Theory*

Much ammunition has been spent by each side attempting to shoot down the other's theoretical tower. The necessary close affinity between appraisal theory and financial principles has made much of this discussion heavy and esoteric.[7]

---

[7] As one witness has pointed out, finance is the application of economic principles and appraisal theory is an application of finance principles. As the direction of analysis moves towards economic principles, it becomes more and more difficult to relate a dispute to the task of valuing the subject property.

The symbols which the finance experts use to communicate and model theories seem clear, but trying to resolve disputes between such experts is of questionable benefit. The court is in no position to examine the economic principles which underlie the assumptions implicit in some models. Moreover, it appears that most of the contention is not over theories but the appraisers' interpretation of the facts. A brief comparison of the two income approaches should illustrate this point.

Plaintiff's appraiser purported to use a discounted cash flow model by estimating annual net cash flow which he then divided by a yield capitalization rate. Although such a formula resembles the direct capitalization method (DCAP) more than a discounted cash flow (DCF), the essence of either lies in the assumptions made by the appraisers. Here, plaintiff's appraiser estimated a single number for the net cash flow because he assumed no growth in future cash flows. The implications of this are that (1) the return on retained earnings (r) would not exceed the cost of capital (k), and (2) he did not anticipate any productivity gains over time or that any new investments would be made.

Defendant's appraisers used two income approaches. First, they used a direct capitalization model whereby they divided estimated earnings for one year by a capitalization rate derived from the study of comparable companies in the marketplace. Their second method was a discounted cash flow method where they estimated the net cash flows for each of ten years plus the terminal value of the unit at the end of ten years. These numbers were then discounted to their present value. In both approaches, defendant's appraisers anticipated future growth in revenues.

Most of the verbal maneuvering and arguments of the witnesses and counsel were aimed at bringing out the assumptions, conclusions and perceptions underlying their choices. For example, defendant contends that plaintiff "mismatches" a yield rate (a DCF concept) with reported earnings (a DCAP concept). However, whether plaintiff's use of an average NROI represents net cash flow or accounting earnings depends upon one's view of the evidence, not theory.

*Estimates of Income*

Plaintiff's appraiser used a five-year historical average (RRB accounting) as his estimate of the net cash flow for the future years. He concluded that where depreciation would be equal to capital expenditures, net railway operating income (NROI) is a reasonable surrogate for net cash flows. He made additions for income attributable to leased equipment and also made adjustments for losses on subsidized passenger service and for the sale of tax benefits. He considered his resulting estimate of net cash flow "conservative" and perhaps too optimistic because he believes inflation hurts rather than helps railroad net cash flows.

Defendant's appraisers based their estimate of income on a statistical analysis of historical reports and the industry trend. In doing so, they concluded that plaintiff's historical experience is not typical of the industry. Accordingly, they developed their estimates based on typical industry margins. Defendant's DCF approach projects future cash flows which grow substantially over ten years.

The court finds itself unpersuaded by plaintiff's use of a five-year average of the NROI as its estimate of net cash flows. Plaintiff used the five-year average based on a perceived five-year cycle. However, the court sees no such pattern in either plaintiff's history or the industries' statistics. If there is such a thing as a cycle, it would appear to be more in the neighborhood of ten years rather than five. For example, plaintiff makes the point that the five-year average was down 48 percent in 1979. However, the five-year average ending in 1983 was up from the five-year average in 1979. Plaintiff argues that defendant's ten-year projections are unrealistic, noting that in 1980 they go from a negative $4 million to a positive $178 million in 1989, which exceeds the all-time high of $125 million realized in 1972. However, if the industry or plaintiff were on a five-year cycle, one would expect to hit another high point in five years rather than ten. Projecting $178 million in 1989, 17 years after the prior high of $125 million, seems conservative. In examining Exhibit 48, setting forth the industry NROI year by year, the years 1979 through 1981 were good years and increasing in amounts. That history

would have given no reason for pessimism as of January 1, 1980.

The court also does not accept plaintiff's position that it earns a rate of return on its retained earnings less than its cost of capital. The authorization for expenditure forms showed management expected significant returns greater than the cost of capital. Plaintiff has expended extraordinary amounts in capital improvements. Plaintiff's own actions reflect optimism and provide a basis for anticipating growth. In its 1979 annual report, plaintiff indicates that it had embarked on "the largest fleet expansion and modernization program in its history." During 1978 to 1980, plaintiff anticipated spending $843 million to acquire or rebuild locomotives and railcars, which is "almost half of its anticipated 1981 power demand." In 1979, plaintiff spent a record $323 million on noncapitalized equipment overhaul, repairs and maintenance. Plaintiff intended to commit "increasing proportion[s] of its financial resources during the next several years to roadway and terminal facilities improvements." In 1981, plaintiff substantially completed restoration of the Rock Island Line at a cost of $100 million. Substantial improvements and expenditures were continued in 1982 and 1983 including the planned construction of a 137-acre container transfer yard in the Los Angeles-Long Beach area.

The market seems to have anticipated growth since, as defendant points out, rail stocks and other indicators were "up." Moreover, although plaintiff may not have the same haul mix as the other railroads, the analysts who projected growth in the industry did not view plaintiff as being much different from the rest of the rail industry.

On the other hand, defendant's proposed values, based upon the ranges of value indicators, appear overly optimistic. For example, defendant forecasts steady, unbroken growth in its discounted cash flow method (except for the year 1983), which is inconsistent with the cyclical nature of the industry. It is also inconsistent with defendant's acknowledgement that the railroad industry is a mature industry with limited options. While it is true that plaintiff's own strategic plans were optimistic, and by admission the best

predictions at that point in time, the purchaser of a stand-alone railroad would not likely be so optimistic.[8]

*Estimated Capital Costs*

In applying the income approach, it is necessary to determine a capitalization rate (DCAP method) or a discount or yield rate, (DCF method), both of which relate to the cost of capital. Since the income from the unit is created by assets which are financed by both debt and equity, it is necessary to determine what is commonly referred to as the weighted average cost of capital (WACC), a weighted blend of the costs of debt and equity. Two main issues arise in this context: (1) the appropriate capital structure or debt equity ratio, and (2) the market cost of equity capital.

(1) *Capital structure.* (Debt-Equity ratio) Plaintiff used a "target structure" comprised of 66 percent equity and 33 percent debt. By comparison, defendant used the actual ratio experienced by plaintiff in each of the years based on the market value of the securities. The ratio thus varied from 61 percent debt/39 percent equity, to 85 percent debt/15 percent equity.

With this issue we have reached a level of financial theory which may be described as one of diminished clarity. One school of thought appears to be that capital structure has very little effect on the cost of capital. The extreme position of that school is the Modigliani-Miller proposition which holds that capital structure does not affect the total cost of capital. However, this proposition is subject to the realities that taxes do impact capital costs. In short, the proposition may not apply except in a "perfect market."[9]

---

[8] The court does not give as much significance to plaintiff's strategic plans as defendant does. This is because the court understands that management does not propose negative five-year plans in response to a chairman's call to battle. Although the Value Line report shows Southern Pacific Company increasing, it noted that Southern Pacific Transportation, plaintiff, would decrease. On the whole, the court finds that defendant's estimates of income are more realistic but should be tempered for reasons noted above.

[9] Brealey and Myers, *Principles of Corporate Finance* 370 (2d ed 1984), points out that Ezra Solomon once said, "A perfect capital market should be defined as one in which the MM theory holds." It should be noted that although the parties only introduced excerpts from certain financial texts as exhibits, they agreed that the court could refer to the complete texts for assistance in resolving the issues presented in this case.

The court understands that while debt increases income to shareholders due to the tax shield, increasing debt also increases the risk to equity which, in turn, increases the cost of equity capital. Two financial authorities conclude:

"Although no completely satisfactory theory has yet been found to explain the existence of optimal capital structure, casual empiricism suggest that firms behave as though it does exist." Copeland and Weston, *Financial Theory and Corporate Policy,* 322 (1st ed 1979).

"Our own view is that there is a moderate tax advantage to corporate borrowing, at least for companies that are reasonably sure they can use the corporate tax shields." Brealey & Myers, *Principles of Corporate Finance* 389 (2d ed 1984).[10]

The court is not persuaded that tax shield benefits adequately account for the use of debt in financing capital needs. Tax laws vary, market perceptions change and differentials in costs between debt and equity make it impossible to trace all of the motivations. The court's task however, is far more modest. All it needs to determine is what the market does, not why it does it. The question is: How should the market's use of debt and equity financing be measured? Based on the testimony of the appraisers, two sub-issues are: (1) should the ratio be based on book value or market value proportions, and, (2) would a potential purchaser use target or actual debt equity ratio proportions?

There does not appear to be a clear answer to the book value-market value issue. Investors do not invest proportionately in a company's stock and debt, but do so in numerous uncoordinated transactions. Book values should, therefore, more accurately reflect the choices of management with regard to the debt-equity ratio. The problem with this logic is that management undoubtedly considers the market value of the company's securities at the point in time when they decide whether to raise debt or equity capital. The strongest argument in favor of using market value proportions is that a purchaser would likely consider such proportions in financing the purchase of the property.

---

[10] Brealey & Myers, *Principles of Corporate Finance* 416 (2d ed 1984), makes the astute observation posited as their "third law" that "[y]ou can make a lot more money by good investment decisions than by good financing decisions."

If the theoreticians cannot resolve the abstract question, it would be foolish for the court to attempt to do so. The best that the court can hope for in this case is to adopt a position which is reasonable in relation to the facts and appraisal approaches used. The court finds that market value proportions should be used. The DCAP and the stock and debt approaches attempt to reflect the existing market conditions, which means market values. The discounted cash flow approach attempts to reflect the choices of a potential purchaser. This would seem to require market values in a "target" ratio intended to maximize the advantages of debt financing.

The question of greater significance is that of target ratio versus actual ratio. The idea of a target capital debt-equity ratio is to estimate the debt equity ratio that a purchaser would probably use. One approach is to assume that the average ratio of the industry reflects the best collective judgment of the industry and thus would be the target sought by a purchaser. However, defendant maintains that the actual capital structure of the subject property should be used because the direct capitalization rates are based on actual capital structures in the marketplace. That may be true, but those rates appear to be derived without regard to capital structure. There is no evidence that when defendant derived its cost of debt that it was weighted or based on any comparison made with capital structures. If debt and equity costs of capital are derived from an industry with an actual average debt-equity ratio of 40-60 and then those rates are applied to the plaintiff's actual debt-equity ratio of 70-30, the result will not be an accurate indication of the plaintiff's actual weighted average cost of capital.

In this case, it is interesting to note that while plaintiff's debt-equity ratios based on market value vary widely from the industry average, its ratios based on book value do not. Plaintiff's use of a debt-equity ratio with ranges of 33-40 percent for debt and 60-67 percent for equity appear more reasonable than defendant's use of the company's actual debt-equity ratios based on a market value approach. It is also worth noting that the ICC found a debt-equity ratio range of 30-40 percent for debt and 60-70 percent for equity.

Without reviewing all of the related evidence and arguments, it appears that defendant's estimate of cost of debt

is somewhat low. Interest rates during the years in issue were some of the highest in our country's history. For example, in 1980 defendant used debt costs of 8.78 percent when it appears that plaintiff was issuing equipment trust certificates at 10.25-13.25 percent and conditional sales agreements at 10-14.25 percent. This difference can be illustrated by looking at defendant's calculation of its weighted average cost of capital for 1980 in the direct capitalization approach. If 10 percent is substituted in place of 8.78 and a 40-60 debt equity ratio is used, the result would be a weighted average cost of capital of 13.302 percent.

It should be noted that defendant's cost of capital estimates may be lower than plaintiff's because of the income tax effects. As Dr. Archer indicated, it is necessary to account for the tax deduction of interest in order to obtain the real cost of such capital. Plaintiff, in rebuttal, points out that NROI already adjusts for such tax savings and therefore to adjust the interest rate would be in error. However, although plaintiff's witness used NROI as a measure, defendant's witnesses did not. Defendant's witnesses used their estimates of net cash flows without adjusting for tax savings. Defendant logically used the after-tax cost of debt in order to properly equate it with the cost of equity capital.

*Cost of equity capital.* It is necessary to distinguish between cost of equity capital for the direct capitalization method and the cost of equity capital for the discounted cash flow method. In the direct capitalization method, the rate represents the relationship between the known income and the known sale prices of the property (in this case, the known prices of the securities). This method does not attempt to consider the holding period or rate of return of capital. On the other hand, in the discounted cash flow method, the appraiser is attempting to estimate the investor's required return, specifically considering elements of risk, holding period, appreciation or depreciation and other relevant facts.

Defendant's appraisers obtained their direct capitalization rate from earnings-price ratios of other rail companies. Plaintiff challenges this method on several grounds. Plaintiff argues that those companies which are not "pure railroads" artificially lower the indicated capitalization rate. This assumes that the diversified companies have less risk

than railroads. The evidence does not support such a general assumption. Another concern is whether the price-earnings ratios were abnormally high due to low recessionary earnings and an optimistic market. It seems reasonable that it is necessary to use a normalized price-earnings ratio with a normalized income. However, it would seem equally plausible to use recessionary earnings with a recessionary price-earnings ratio. The whole point of the exercise is to determine the relationship in the market between earnings and value (price). Hence, any consistent comparisons should be of assistance to the appraiser in ascertaining market perimeters.

Defendant's discounted cash flow method used a yield rate derived from a dividend growth model which considered the dividends from all railroads in the Value Line group. Plaintiff points out that while defendant used growth rates in its cash flows comparable to those found by the ICC, it used a lesser growth rate in the dividend growth model. This is not necessarily inconsistent since the growth rate in the dividend growth model should reflect the industry-wide or "all investors" expectations. The growth rate in plaintiff's expected cash flows may be different from the industry. However, plaintiff's point appears valid here because the average growth rates projected for plaintiff by the analysts were lower than the composite average of all railroad growth projected.

By comparison, plaintiff's expert, in addition to using earnings-price ratios, also analyzed rail income versus nonrail income, the income of utilities in comparison with rails and compared rail debt costs with government securities. His conclusions led him to results that were very similar to the ICC capital costs. Although defendant criticizes the methodology, it seems reasonable to the court to consider all bench marks rather than just to rely upon one.

In perspective, the court finds that plaintiff's weighted average cost of capital comes closest to the mark. For the reasons indicated above, the court believes that defendant's weighted average cost of capital tends to be lower than the range indicated by the market data. However, although plaintiff's estimate of capital costs appears more accurate, the court must give less weight to the value indicated by plaintiff's income approach. Plaintiff's use of the five-year average

NROI, in the court's opinion, fails to reflect the growth anticipated for plaintiff. The evidence indicates that the market anticipated growth in the future for plaintiff. The court also finds that the many limiting assumptions underlying the use of plaintiff's DCF model are not consistent with the facts and therefore the model tends to undervalue the subject property.

## Stock and Debt Approach

The stock and debt approach assumes that publicly traded securities of a corporation are a valid market-driven indicator of its going concern value. Here the problem is complicated by the fact that plaintiff is a wholly owned subsidiary of a publicly owned company. While some of plaintiff's debt securities are publicly traded, plaintiff's common stock is not. This requires the appraisers to allocate the value of the holding company's common stock between the plaintiff railroad and the other nonrailroad subsidiaries of the holding company. In addition, although plaintiff is primarily a railroad business, it also owns substantial nonrail assets. Once the value of plaintiff's stock and debt is ascertained, the value of its nonrail assets must be deducted in order to arrive at the taxable unit. As might be anticipated, this is not a task amenable to methods of great precision.

> "It must be recognized that rather crude methods of estimation have to be resorted to at various stages in the typical case * * *.
>
> "The greater the relative importance of the magnitudes that have to be dealt with as objects of a technique of approximation, the less trustworthy will be the stock and debt evidence." National Association of Tax Administrators, *Appraisal of Railroad and Other Public Utility Property For Ad Valorem Tax Purposes.*[11]

There are two basic methods for allocating the value of the holding company's common stock to the subsidiaries. In this case, each party used one of those methods. Plaintiff's appraiser used the income-influence method, which allocates

---

[11] It should also be noted that the NATA report comments:

"Naturally the method is completely inapplicable when all the interests in a given corporation are wholly owned by another so that there is no market activity in the firm's equities and debt."

the known stock value of the holding company to the subsidiaries based on each subsidiary's proportion of the total income of the holding company. The basic assumption of this method is that earnings fairly reflect the value of the underlying assets. The second method, used by defendant's appraisers, is to separately value each subsidiary. Each subsidiary's debt is publicly traded, so the real need is to allocate the parent corporation's common stock to the subsidiaries plus the value of the debt not publicly traded. Each of these methods will be examined in more detail.

Plaintiff's appraiser used the income-influence method for the years 1980 through 1982. He concluded that the method would give meaningless results if applied to the years during which the railroad incurred losses because it would attribute zero value to the railroad assets. Thus, for the years 1983 and 1984, he used price-earnings multipliers. To remove the nonrail assets from the total stock and debt value indicated for plaintiff, he used the direct method of deducting the assessed values of the nonrail assets.

The court finds several problems with plaintiff's stock and debt approach. First, the income-influence method is not very reliable. In fact, plaintiff's appraiser himself acknowledged its significant weaknesses. Also, the court disagrees with the appraiser's view on the indications of value from the price-earnings multiple approach. Plaintiff's appraiser believes that the nonrail companies have a higher value than indicated by their earnings. This seems inconsistent since he maintains that the railroad is not as valuable because of its low earnings. While the market may have seen potential and glamor in the nonrail assets, it is apparent to the court that the market saw potential for the railroad industry, particularly after the Staggers Act.

The court also finds plaintiff's "residual approach" questionable. This approach first assigns a value to the nonrail companies and whatever is left is assigned to the railroad. In this case, the method leads plaintiff's appraiser to the point where he must conclude that the railroad can be worth less than the amount of its debt. The court finds no evidence in these cases to support such a conclusion.

In the last step of the stock and debt process, plaintiff's appraiser used assessed values to determine the value of

the nonrail assets to be deducted. Although defendant disputes the use of this method, its use seems approved "where adequate information is available on local assessment statutes and practices." Plaintiff's appraiser was not familiar with the local information but assumed the assessments were intended to reach true cash value. While the court has some concern with this aspect, additional questions are raised where assessed values are used for some property and not others. The inconsistency would appear to be a potential for error. The court also disagrees with plaintiff's treatment of the timber values where they are discounted 75 percent, which is too great, or totally omitted.

Defendant's appraisers, in utilizing the direct stock and debt method, used two different techniques. In their Case I technique, they calculated the equity value directly. Since this indicated value is not relied upon by defendant's witnesses in forming their opinion of value, the court will not consider it. In their Case II technique, they calculated the equity value indirectly by allocating the total holding company's equity to the subsidiaries using a price-sales ratio for nonrail companies and a price-earnings ratio for rail companies. Applying these ratios to the subsidiaries produced a total larger than the actual known equity value. Accordingly, defendant's appraisers had to scale the parts down to fit the total. One weakness in their approach was that defendant's appraisers, in coming to their conclusions of value, failed to deduct for the timber and real estate assets, deducting only the trucking assets. Plaintiff's greatest criticism is that defendant's stock and debt approach is in essence the same as its direct capitalization approach because it uses the same figures and algebraically gives the same result. The court disagrees with plaintiff's conclusion because while some factors may be the same, some are different. The multiples for the nonrail industries and the scaling technique makes for a different indication of value.

Defendant's stock and debt approach has also been challenged on the grounds that the companies from which defendant derived the price-sales ratios and the price-earnings ratios are not true comparables. While the court recognizes that they have limited comparability, it believes that they are adequate for the purposes as used in these cases. The price-sales ratios appear a reasonable general measure as well

as the price-earnings ratio. The court notes that plaintiff's appraiser also used different price-earnings ratios for different industries. The court does find, however, that defendant's stock and debt indicators of value should be reduced to account for all of the nonrail assets.

Having made the determinations above, it becomes necessary to establish a specific system value. To say that this is not easy is an understatement of notable proportions. The process of estimating a value for property remains, ultimately, more art than science. *Benson v. Dept. of Rev.,* 9 OTR 129 (1982). This is inherent from the concept of value, both by virtue of the definition and also by application thereof. In *Knappton Towboat Co. v. Chambers,* 202 Or 618, 625, 276 P2d 425, 277 P2d 763 (1954), the court recognized that:

> "Men of equal learning and sound judgment may give greater weight to one factor than to another, thus causing variations in the end-result, so that in all assessments latitudes of judgment must be granted an assessing agency."

Part of the inexactness that must be acknowledged in this process is the notion of market value. A market deals with ranges of value rather than one set value. "As has often been said, 'true cash value' is a range of value, rather than an absolute." *Price v. Dept. of Rev.,* 7 OTR 18, 25 (1977). Although the court is required to determine a specific value or "point estimate," it is well to keep in mind the context in which that value is established. What has been said with regard to the reconciliation process for appraisers appears applicable to the process this court uses in making its determination.

> "Reconciliation is the part of the valuation process in which the appraiser most directly draws upon his or her experience, expertise, and professional judgment to resolve differences among the value indications derived from the application of the approaches. The appraiser weighs the relative significance, applicability, and defensibility of each value indication and relies most heavily on the one that is most appropriate to the purpose of the appraisal. The conclusion drawn in the reconciliation is based on the appropriateness, the accuracy, and the quantity of the evidence in the entire appraisal." American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 505 (8th ed 1983).

As indicated above, the court found weaknesses in appraisals of both parties. For example, although defendant failed to properly account for nonrail assets (timber and real estate) in the stock and debt approach, plaintiff's method was less reliable. Likewise, in the income approach, the plaintiff's discount rate appeared more appropriate, but plaintiff's use of a five-year average of NROI as an estimate of net cash flow was rejected. The court is not in a position to make a new appraisal, which would be desirable, in order to account for all of the findings above. However, it is confident that based on those findings and taking into consideration the proportional differences in the elements, as well as the value indicators of the respective appraisals, it can and should determine the required specific value for each of the years involved.

Accordingly, the court finds that the true cash value of the unit and the value allocable to Oregon as of January 1 of each of the years involved are as follows:

| YEAR | SYSTEM VALUE | ALLOCATION FACTOR | OREGON TCV |
|------|--------------|-------------------|------------|
| 1980 | $1,200,000,000 | 7.59 | $91,080,000 |
| 1981 | 1,300,000,000 | 7.21 | 93,730,000 |
| 1982 | 1,200,000,000 | 6.57 | 78,840,000 |
| 1983 | 1,000,000,000 | 6.04 | 60,400,000 |
| 1984 | 1,200,000,000 | 7.07 | 84,840,000 |

Costs to neither party.