IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

JUSTIN LAWRENCE, )
)
Plaintiff, ) TC-MD 130103C
)
v. )
)
WASHINGTON COUNTY ASSESSOR, )
)
Defendant. ) **DECISION**

Plaintiff has appealed the real market value (RMV) of a duplex identified in the

assessor's records as Account R473455 for the tax years 2011-12 and 2012-13. Trial in the

matter was held by telephone July 31, 2013. Plaintiff, a mortgage broker and real estate owner,

appeared and testified on his own behalf. Defendant was represented by Garrison Winkle-Bryan,

a registered property appraiser with Washington County. Plaintiff's exhibits 1 through 15, and

Defendant's exhibit A, were admitted at trial.

## I. STATEMENT OF FACTS

A. *The subject property*

The subject property is a 3,136 square foot duplex built in 1975 and purchased by

Plaintiff on January 21, 2011, for $149,000. (Def's Ex A at 5; Ptf's Ex 2.) The property had

been listed for sale on several occasions beginning in April 2008 for $379,000. (Ptf's Ex 3.)

The list price was reduced to $359,900 in May 2008 (approximately a month after the $379,900

listing), then reduced to $299,900 on February 2, 2009. (Trl Test; Ptf's Ex 3.) The February

2009 listing at $299,900 was an attempted short sale. (Def's Ex A at 5; Ptf's Ex 3.)[1] After a

---

[1] Although neither party testified to the property's listing history before 2009, Plaintiff's exhibits show the home was listed on April 29, 2008, for $379,000, and then reduced approximately one month later to $359,000. It continued to be listed for $359,000 for at least six months (until October 25, 2008), and was later reduced to the $299,000 figure on February 2, 2009. (Ptf's Ex 3.)

number of price reductions, the bank foreclosed on the property in October 2009, and listed the duplex for $259,900. (Def's Ex A at 5.) Following a failed sale, the property was again listed in April 2010, for $218,900. (*Id*.) The asking price had been reduced to $175,900 as of September 1, 2010, and subsequently reduced to $156,900 as of December 27, 2010, before being purchased by Plaintiff for $149,000. (Ptf's Ex 2.) According to the uncontroverted testimony, the property was twice offered for sale at auction; neither auction generated a sale.

The property is located on SW Walnut Street in West Tigard, which the parties agree is a busy thoroughfare. The street is paved, 50 feet wide, and has a middle turn lane. (Trl Test; *See also* Def's Ex A at 5; Ptf's Ex 10.) Both units in the duplex are approximately 1,500 square feet in size, and the structure is located on slightly less than one acre of property (0.93 acres). (Def's Ex A at 5.) Each two-story unit has three bedrooms and two bathrooms, and there is an attached two-car garage. (Def's Ex A at 5; Ptf's Ex 1.) The parties agreed at trial that the duplex has three parking spaces. There are two garage bays, one for each tenant, and one additional parking spot next to the garage that is presumably shared by the two duplex tenants. (Def's Ex A at 5.) The parties also agree that there is no on-street parking allowed in front of the subject property, and, according to Plaintiff, the nearest additional parking is two blocks away.

The duplex is located on a steeply sloped lot, and Plaintiff testified that there is no access to the back yard from the front. Photographs submitted by Defendant support that testimony. (Def's Ex A at 10.) Due to the steep topography, the duplex has one level of above-grade living space, and additional living space below grade in what is sometimes referred to as a finished daylight basement. According to the uncontroverted testimony, only one of the three bedrooms in each unit is on the upper above grade level.

/ / /

Defendant's appraisal indicates that "[t]he property lies within a drainage hazard buffer and is considered to be uninhabitable wetlands with no functional utility," and that the "site improvements [which include the structure, driveway, and single additional parking space] are located on the far northwest corner of the property which limits the available parking." (Def's Ex A at 5.) The parties agree that the duplex is of average quality construction. (*See id*.) Plaintiff testified on cross examination that the property needed work when he bought it and that it took three to four months for Plaintiff to rent the property after his purchase. Plaintiff further testified that he rents each unit for $1,200 per month, but that the price includes utilities, which average approximately $230 per month.

The subject property has an RMV on the assessment and tax rolls of $293,950 for the 2011-12 tax year and $247,753 for the 2012-13 tax year. (Def's Ex A at 2; Ptf's Compl at 2.)[2] The 2012-13 roll value reflects a $35,497 value reduction by the Board from the assessor's original $283,250 RMV. (*See* Ptf's Compl at 2.) The maximum assessed value (MAV) is $260,820 for the 2011-12 tax year and $268,640 for the 2012-13 tax year. (Def's Ex A at 2.) Thus, in accordance with ORS 308.146(2), the assessed value (AV) is $260,820 for the 2011-12 tax year and the $247,753 for the 2012-13 tax year. (*Id*.; Ptf's Compl at 2.)

B.    *The parties' valuation approaches*

1.    *Plaintiff's evidence*

Plaintiff's case is based largely on the $149,000 purchase price, the property's listing history, and the physical and functional problems affecting the property (only one above-grade bedroom, limited parking, busy street, steep sloping topography, and inutility of yard the due to

---

[2] Defendant lists the tax year 2012-13 RMV at $283,250 in its valuation report, but the Board order attached to Plaintiff's Complaint for that year indicates that the Board reduced the value from $283,250 to $247,753. (Def's Ex A at 2; Ptf's Compl at 2.)

access problems and wetlands). Plaintiff applies Defendant's 22 percent market adjustment for properties that are bank owned or short sales, which increases his January 2011 purchase price of $149,000 to $182,000. (Trl Test; Def's Ex A at 12.)[3]

Plaintiff did present information on four comparable sales, all of which were either bank owned or short sales. (Ptf's Ex 1.) Plaintiff testified that comparable sales were submitted as evidence for the RMV of the subject property as of January 1, 2011. Those sales occurred in September 2010, February 2011, March 2011, and January 2013. (*Id.*) Plaintiff indicated adjustments on his sales grid for all four of his comparable sales, but only *applied* the adjustments to his comparable sale number 2. (Ptf's Trl Test.) The unadjusted sale prices for comparables 1, 3, and 4 were $144,800, $160,000, and $155,000, respectively. (*Id.*) Plaintiff's comparable 2 sold in January 2013 for $203,000. Plaintiff's adjusted sale price for that sale, which was a short sale, is $172,200. (*Id.*)

2. *Defendant's evidence*

Defendant's appraiser Winkle-Bryan submitted a valuation report which estimates the value of the subject property on the two applicable assessment dates (January 1, 2011, and January 1, 2012). (Def's Ex A.) Winkle-Bryan used all three recognized approaches to value: the sales comparison approach, the cost approach, and the income approach. (*Id.* at 3, 12-31.) His sales comparison approach used eight comparable sales, four for each tax year. (*Id.* at 12, 18.) The comparable sales for the 2011-12 tax year sold between April 2010 (comparable #2) and March 2011 (comparable #1), for prices between $235,000 and $266,512. (*Id.* at 12.) Winkle-Bryan made adjustments for a variety of differences between his comparable sales and

---

[3] Defendant applied a 22 percent adjustment to its comparable sale #1, adding $51,700 to the purchase price because that property involved a short sale. Winkle-Bryan acknowledged on cross-examination that county sales data shows a 22 percent differential between "bank" and "short" sales versus typical market transactions.

the subject property that he deemed relevant for estimating the value of the subject, such as location, size, quality, physical condition, number of bedrooms and other amenities, and arrived at adjusted sale prices ranging from a low of $221,521 to a high of $255,400. (*Id*.) Winkle-Bryan concluded that the indicated value for the subject property as of January 1, 2011, was $240,000. (*Id*.)

For the 2012-13 tax year, Winkle-Bryan used sales occurring between May 2011 (comparable #3) and January 2012 (comparable #4). (*Id*. at 18.) His comparables sold for prices ranging from a low of $177,500 to a high of $254,000. (*Id*.) Winkle-Bryan adjusted his comparable sales for the 2012-13 tax year as he had done for the prior tax year. His adjusted sales prices ranged from a low of $224,750 to a high of $250,815. (*Id*.) Winkle-Bryan's value conclusion for the subject property as of January 1, 2012, was $235,000. (*Id*.)

Winkle-Bryan valued the property under the cost approach, using $80.97 per square foot for main (above grade) living area, $37.27 for basement living area, and $35.98 for low-cost finished garage space. (*Id*. at 24-25.) Winkle-Bryan testified that those figures came from the Oregon Department of Revenue's cost factor book and that he used them as his base unit values for both tax years. (*Id*. at 24-25) Using those numbers, Winkle-Bryan calculated an estimated cost new for the improvements of $205,700. (*Id*. at 24-25) Next, the appraiser made adjustments for depreciation for the two tax years, then added a "site value" for the raw land, plus an additional amount for site improvements, and arrived at indicated values of $255,000 for the 2011-12 tax year and $259,000 for the 2012-13 tax year. (*Id*. at 24-25) The subject property was 36 years old on the January 1, 2011 assessment date, and depreciation, especially physical, was significant ($65,900 for the 2011-12 tax year and $56,600 for the subsequent year). (*Id*. at 24-25)

Winkle-Bryan's third valuation approach was the income approach. He used an estimated monthly rental income figure of $1,825 for both tax years based on income from six comparable properties. (*Id*. at 26, 29.) He applied a monthly gross rent multiplier (GRM) of 11.85 percent for the 2011-12 tax year and 11.22 percent for the 2012-13 tax year based on all the duplex income data Defendant had in its records for the county, but primarily including the towns of the Beaverton, Tigard, Tualatin, and Sherwood. (*Id*. at 26, 28-29, 31.) The GRM range was 7.97 percent to 15.71 percent for 2011 and 7.89 percent to 15.03 percent for 2012. (*Id*. at 28, 31.) Annualizing that data, Winkle-Bryan arrived at estimated values of $260,000 for the 2011-12 tax year and $246,000 for the 2012-13 tax year. (*Id*. at 26, 29.)

After considering his value indications under those three approaches, Winkle-Bryan concluded that the RMV of the subject property was $240,000 for the 2011-12 tax year and $235,000 for the 2012-13 tax year. (*Id*. at 3.) Winkle-Bryan ascribes $115,410 to the land and $224,590 to the improvements for the 2011-12 tax year, and $110,223 to the land and $124,777 to the improvements for the 2012-13 tax year. (*Id*.)

C.      *The parties' requests*

Plaintiff requests a reduction in the RMV to $182,000 for both tax years. As indicated directly above, Defendant requests RMVs of $240,000 for the 2011-12 tax year $235,000 for the 2012-13 tax year. Those values are both below the MAV for the property for each tax year, which would result in AVs of $240,000 and $235,000, respectively for the two tax years at issue. However, if the court were to accept Defendant's tax year 2011-12 RMV of $240,000, it could not order a change in that value because that tax year is before the court under the provisions of ORS 305.288[4] and, as applicable to this case, the court cannot order a change or correction in the

---

[4] For ease of reference, the court will use the 2009 edition of the Oregon Revised Statutes unless noted otherwise.

RMV unless the value found by the court is at least 20 percent below the RMV on the tax rolls.[5] The tax year 2011-12 RMV on the tax rolls is $293,950, and a reduction to $240,000 will only amount to 18.4 percent, a number slightly shy of the minimum 20 percent threshold required under the statute. The court must find an RMV of at least $235,160 to meet the 20 percent "error" requirement of subsection (1) of ORS 305.288.

## II. ANALYSIS

In Oregon, all real property "not exempt from ad valorem property taxation or subject to special assessment shall be valued at 100 percent of its real market value." ORS 308.232.

RMV is defined in ORS 308.205(1) as follows:

"Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

RMV is determined by the particular methods and procedures adopted by the Department of Revenue. ORS 308.205(2). There are three approaches to valuation (income, cost, and sales comparison) that must be considered when determining the RMV of a property, although they need not all be developed. OAR 150-308.205-(A)(2)(a) (stating that all three approaches must be considered, although all three approaches may not be applicable to the valuation of a given property); *see also Allen v. Dept. of Rev.*, 17 OTR 248, 252 (2003); *Gangle v. Dept. of Rev.*, 13

---

[5] The relevant language in the statute provides:

"(1) The tax court shall order a change or correction applicable to a separate assessment of property to the assessment and tax roll for the current tax year or for either of the two tax years immediately preceding the current tax year, or for any or all of those tax years, if all of the following conditions exist:

"* * * * *

"(b) The change or correction requested is a change in value for the property for the tax year and it is asserted in the request and determined by the tax court that the difference between the real market value of the property for the tax year and the real market value on the assessment and tax roll for the tax year is equal to or greater than 20 percent."

OTR 343, 345 (1995). When value is appealed to the court, the approach to be used (or combination of approaches) is a question of fact to be determined by the court upon the record. *Pacific Power & Light Co. v. Dept. of Revenue*, 286 Or 529, 533, 596 P2d 912 (1979) ("[W]hether in any given assessment one [valuation] approach should be used exclusive of the others or is preferable to another or to a combination of approaches is a question of fact to be determined by the court upon the record.").

As the party seeking affirmative relief, Plaintiff bears the burden of proving that the subject property's RMV on the tax roll is incorrect. *See* ORS 305.427. Plaintiff must establish his claim "by a preponderance of the evidence, or the more convincing or greater weight of evidence." *Schaefer v. Dept. of Rev.*, TC No 4530, WL 914208 at *2 (July 12, 2001) (citing *Feves v. Dept. of Revenue*, 4 OTR 302 (1971)). Evidence that is inconclusive or unpersuasive is insufficient to sustain the burden of proof. *Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990).

This court has previously noted that value is a range rather than an absolute. *Price v. Dept. of Rev.*, 7 OTR 18, 25 (1977). "The value of property is ultimately a question of fact." *Chart Development Corp. v. Dept. of Rev.*, 16 OTR 9, 11 (2001) (citation omitted). Finally, "the court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

The Oregon Supreme Court has stated that "[a] recent sale of the property in question is important in determining its market value." *Kem v. Dept. of Rev.* (*Kem*), 267 Or 111, 114, 514 P2d 1335 (1973). The court in that case went on to state that: "[i]f the sale is a recent, voluntary arm's length transaction between a buyer and seller, both of whom are knowledgeable and willing, then the sale price, while certainly not conclusive, is very persuasive of the market

value." *Id*. at 114 (citations omitted); *see also Sabin v. Dept. of Rev.*, 270 Or 422, 426-27, 528 P2d 69 (1974); *Equity Land Res. v. Dept. of Rev.*, 268 Or 410, 414-15, 521 P2d 324 (1974). The two important considerations are whether or not the sale was "recent" and whether it was "arm's length." *Kem*, 267 Or at 114-15.

The big question in this case is whether Plaintiff's purchase was arm's length and therefore representative of market value. The court is persuaded by a preponderance of the evidence that Plaintiff's purchase does reflect an arm's length transaction between knowledgeable parties, and that he acquired property in January 2011, making it "recent" with respect to the 2011-12 tax year assessment date of January 1, 2011. *See generally* ORS 308.007. Plaintiff paid $149,000 after the property had been listed on the open market for approximately 32 months at steadily declining prices beginning in April 2008 of $379,000. Defendant suggested through its cross examination of Plaintiff that the subject property was originally listed "way too high," yet Defendant's own appraisal data shows that the market was falling, which would tend to indicate a higher value when the property was listed in April 2008. For example, Defendant's comparable sales #2, which was presented for the 2011-12 tax year, was adjusted downward $14,100 because that property sold April 19, 2010, approximately eight months before the applicable assessment date for that tax year, an adjustment that amounts to approximately $1,850 per month for calendar year 2010. The list price of the subject property at the time of purchase in January 2011, which, again, was 32 months after the original $379,000 list price in April 2008, was $156,900.[6]

Plaintiff adjusts his purchase price upwards 22 percent based on Defendant's data

---

[6] Defendant repeatedly referred to April 2008 as the original list date, but the subject property was first listed for sale on November 4, 2005, then taken off the market May 15, 2006. (Ptf's Ex 3.) After nearly a two-year hiatus, the property was relisted in April 2008. It is that second listing of the property that Defendant referred to as the "original" listing.

showing that bank-influenced sales tend, on average, to sell for 22 percent less than residential properties sold by noninstitutional owners. Plaintiff's adjusted sale price, applying that 22 percent differential, is $182,000. Moreover, there is considerable compelling evidence about the various negative attributes of the subject property set forth in the facts above. Those problems would logically reduce the value of the property. Those problems would logically reduce the value of the property.

Defendant, for its part, did present a valuation report. However, the court has concerns about the reliability of Defendant's appraisal. Defendant's appraisal witness Winkle-Bryan did not strike the court as particularly knowledgeable about certain common aspects of property valuation. For example, Winkle-Bryan was asked on cross-examination about a note in a property listing stating all offers must be from pre-qualified buyers, and he was unable to testify whether that meant that the property was or was not financeable. The witness was also unable to answer Plaintiff's question about average marketing times for various types of residential property and had no opinion as to whether such information was relevant.

Winkle-Brian also had problems with his own appraisal. For example, he testified the subject had insufficient parking and no on-street parking to compensate, but did not adjust for the existence of on-street parking for one of his sales comparables, and when Plaintiff noted on cross exam that that comparable did in fact have such parking, Winkle-Bryan testified without explanation or elaboration that it did not affect his adjusted sale price for that property or his overall opinion of value. In another instance, Winkle-Bryan acknowledged that he applied the same square footage adjustment to "upper" and "lower" space on his comparable sales, and testified that he felt there was no problem with that adjustment and no difference in value between the two types of living space. Plaintiff's concern, which the court shares, is that the

subject's "lower" space is below grade whereas none of Defendant's "lower" level finished space is below grade.[7]  In the court's experience, appraisers typically apply a lower value to below grade (e.g., basement) space, finished or unfinished (with a higher value for finished, but lesser than all above grade space nonetheless).  And, Plaintiff asked Winkle-Bryan if he had an opinion as to why he testified to a value estimate of $240,000 as of January 1, 2011, for the subject property when it did not sell for six months immediately prior to that date at lower listing prices - it was listed on June 7, 2010, for $193,900, and then reduced to $175,000 on September 1, 2010.  (Ptf's Ex 2.)  The witness initially testified that he did not know why the property did not sell at those prices.  When pressed further on the matter Winkle-Bryan testified that his appraised value estimate could be incorrect.  He also acknowledged on cross-examination that there were certain errors or misleading information in his appraisal report, matters that would seem to affect value, but testified that he did not believe those factors in any way affected his value estimate.  While the court appreciates the witness's candor, his testimony and a value report are nonetheless concerning.

Defendant did present a value estimate based on the cost approach, but the property was more than 35 years old as of the January 1, 2011, assessment date for the first of the two tax years under appeal and the age of the property makes that approach of questionable value because of the extreme adjustments necessary, as Defendant has done in its report.

Defendant's income approach does suggest a value higher than Plaintiff's estimate for the subject property, but the appraiser used GRMs in the middle of a range (11.85 and 11.22) that varied from a low of approximately eight percent to a high of 16 percent.  (Def's Ex A at 26, 28, 29, 31.)  The parties agree that the subject property suffers from some problems that likely to do

---

[7] Defendant's appraisal differentiates between a "main" living floor space, "upper" floor space, and "lower" finished floor space.  (Def's Ex A at 18.)

not affect many of the properties in the data pool the county used to establish its GRM. And, Defendant's appraiser did not provide any analysis or explanation for how he arrived at the GRM that he used. Thus, the court is presented with generalized raw unrefined data without the benefit of expert analysis. Plaintiff presented sale that had a GRM of 10.8 (sale #4) and, when cross-examining Defendant's appraiser stated that his (Plaintiff's) comparable number 1 had a GRM of seven . (Ptf's Exs 5, 8.) Reducing the rate to 8.3 percent provides an indicated value of $181,770, which is very close to Plaintiff's asserted value of $182,000. That number is also supported by the purchase price adjusted by Defendant's 22 percent bank sale modifier.

In the end, the court finds Defendant's valuation report unreliable and unpersuasive. While an appraiser can put together a report that appears mathematically and perhaps even scientifically precise, the process is, as former Tax Court Judge Byers observed on more than one occasion, more of an art than science. *Southern Pacific Trans. Co. v. Dept. of Rev.*, 11 OTR 138, 160 (1989) ("[t]he process of estimating value for property remains, ultimately more art and science"), citing *Benson v. Dept. of Rev.*, 9 OTR 129 (1982).

Thus, while Plaintiff's valuation grid, which relies on four comparable sales, was not particularly persuasive, and admittedly contained numerous errors, the court believes Plaintiff's $182,000 value estimate and request is a better indicator of the RMV of the subject property than Defendant's appraised values of $240,000 for the 2011-12 tax year and $235,000 for the 2012-13 tax year. The court is cognizant that it is determining the same RMV for both the 2011-12 and 2012-13 tax years and that value often changes from year to year. However, while ORS 305.412 gives the court jurisdiction to determine RMV on the basis of the evidence and without regard to the values pled by the parties, there is little evidence for the court to find a different value for the two tax years and Defendant estimated essentially the same value for both tax years. There is no

other evidence of market conditions from which the court could apply any adjustment that may be warranted.

## III.  CONCLUSION

The court has carefully considered the parties' evidence and concludes that Plaintiff has established by a preponderance of the evidence that the RMV of the subject property was $182,000 for the two tax years at issue.  Although Plaintiff's $149,000 purchase in January 2011 was from the lending institution following a foreclosure, his requested value is supported by Defendant's 2011 county-wide market derived adjustment of 22 percent for "bank owned" properties and "short" sales.  The court found problems with the reliability of Defendant's valuation report and finds Plaintiff's evidence more indicative of market value than Defendant's value estimates in its appraisal report.  Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is granted and the RMV of the subject property, Account R473455, was $182,000 as of January 1, 2011, and January 1, 2012.

Dated this ___ day of September 2013.

DAN ROBINSON
MAGISTRATE


*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within <u>60</u> days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Magistrate Dan Robinson on September 4, 2013. The Court filed and entered this document on September 4, 2013.*